**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TEMPLAR ENERGY LLC, *et al.*,[1] | Case No. 20-11441 (BLS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A) (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING A SALE HEARING AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (IV) SCHEDULING AN AUCTION, (V) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND AUCTION, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF; AND (B) (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this motion (this Motion"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for (a) an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**, (i) approving the bidding procedures (the "Bidding Procedures") in substantially the form attached as Exhibit 1 to the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Templar Energy LLC (4719), TE Holdcorp, LLC (6730), TE Holdings, LLC (3115), TE Holdings II, LLC (N/A), Templar Operating LLC (0810), Templar Midstream LLC (3275), and TE Holdings Management LLC (7467).  The address of the Debtors' corporate headquarters is 4700 Gaillardia Parkway, Suite 200, Oklahoma City, Oklahoma 73142.

Bidding Procedures Order to govern the sale (the "Sale") of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Assets"); (ii) approving the form and manner of notice with respect to the Debtors' selection of one or more stalking horse bidders (each a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary[2]; (iii) scheduling an auction for the sale of the Assets (the "Auction") and a hearing to consider approval of the Sale (the "Sale Hearing") and approving the form and manner of the notice thereof; (iv) establishing procedures for the assumption and assignment of executory contracts and unexpired leases and approving the form and manner of the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "Cure Notice"); and (b) an order (the "Sale Order") (i) authorizing the Sale of the Assets free and clear of all claims, liens, and encumbrances; (ii) approving the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidder; and (iii) granting related relief.   In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      In recent years, independent oil and gas companies in the Mid-Continent region, such as the Debtors, have been particularly hard-hit by volatile market conditions and have faced operational challenges unique to the region, including complex geological characteristics. The Debtors and their business have been undermined by persistently low oil and gas prices, worsened in recent months due to two unprecedented developments – an oil "price war" between OPEC and Russia and the COVID-19 pandemic.   Even before the onset of these most recent

---

[2]     Unless otherwise noted, capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures or the First Day Declaration (defined below), as applicable.

challenges, the Debtors faced rapidly declining liquidity, exacerbated by a redetermination of the borrowing base under the Debtors' reserve based revolving loan facility (the "RBL Facility"), which gave rise to an accelerated repayment schedule for a portion of the loan.

2.    As detailed in the *Declaration of Brian Simmons in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration"), given the Debtors' declining liquidity, in October 2019, the Debtors engaged restructuring advisors to assist the Debtors in assessing strategic alternatives.  Shortly thereafter, the Debtors, with the assistance of their advisors, began discussions with the prepetition administrative agent (the "RBL Agent") and lenders (the "RBL Lenders") under the RBL Facility regarding a forbearance agreement in connection with certain defaults under the RBL Facility, including the failure to make certain deficiency payments as a result of the borrowing base redetermination.  After entering into a short-term forbearance agreement, the Debtors engaged in discussions with the RBL Agent and the RBL Lenders regarding potential restructuring transactions.  The Debtors, in consultation with their advisors and with input from the RBL Lenders, ultimately decided that marketing all or substantially all of their Assets was in the best interests of their stakeholders, and the RBL Lenders continued to forbear from exercising rights and remedies under the RBL Facility during the marketing process.  Accordingly, the Debtors, with the advice and assistance of their advisors, began to pursue a sale of the entire business and formally commenced a prepetition sale process on February 3, 2020.

3.    Through this Motion, the Debtors, with the assistance of their proposed investment banker, Guggenheim Securities, LLC ("Guggenheim Securities"), seek to continue and conclude the marketing process they began approximately four months ago as expeditiously as possible.  Since commencing the marketing process, the Debtors have received a robust response,

particularly in light of current market conditions.  Credible parties have submitted indications of interest and are progressing towards the submission of binding bids.  While the Debtors had hoped to enter into a purchase agreement with a Stalking Horse Bidder prior to the Petition Date, the Debtors were unable to do so given liquidity and other constraints.  However, the Debtors are actively negotiating with several parties and expect to reach agreement with a Stalking Horse Bidder on the terms of a stalking horse bid that are consistent with the terms of this Motion in the near term.

4.     The Debtors seek to establish court approved bidding procedures, give appropriate notice to creditors and parties in interest, and otherwise begin advancing to an auction and sale hearing.  By this Motion, the Debtors seek to establish such procedures and obtain approval and authority to enter into one or more Stalking Horse APAs (as defined below) with one or more Stalking Horse Bidders, as applicable, and potentially grant pre-approved bid protections in advance of the Auction, subject to the conditions set forth in the Bidding Procedures Order.

5.     Upon conclusion of the Auction and selection of the highest or otherwise best bid(s), the Debtors request that the Court enter the Sale Order authorizing and approving the Sale free and clear of all claims, liens and encumbrances.  At the Sale Hearing, the Debtors will also seek approval pursuant to Bankruptcy Code section 365 of the assumption and assignment of the relevant executory contracts and/or unexpired leases to the Successful Bidder(s) for the Assets.

6.     In addition, the Debtors negotiated the Restructuring Support Agreement with the RBL Agent and the RBL Lenders which provides, among other things, that the RBL Agent and RBL Lenders have agreed to support the Sale and vote in favor of a prepackaged liquidating chapter 11 plan (the "Plan") to distribute the sale proceeds and to wind down the Debtors' remaining estates.  On May 31, 2020, the Debtors launched their prepetition solicitation

of the Plan and, prior to the Petition Date, the RBL Lenders voted unanimously in favor of the Plan. The Debtors then commenced these chapter 11 cases (the "Chapter 11 Cases"), with the support of the RBL Lenders, who are providing a debtor-in-possession senior secured superpriority revolving credit facility (the "DIP Facility") to fund the sale process and the Debtors' operations during the pendency of these Chapter 11 Cases, and to continue marketing the Debtors' assets in pursuit of a value-maximizing sale.

7.      The Debtors seek to promptly effectuate the court-supervised marketing and auction process. Speed is critical here because, even with the additional liquidity of up to $25 million to be provided by the DIP Facility, the Debtors will run of cash within just a few months, and any costs incurred in these Chapter 11 Cases will decrease distributions to the already deeply impaired RBL Lenders. The Debtors' receipt of the DIP Facility from the DIP Lenders is conditioned on the Debtors' pursuit of an expedited sale process and, without access to those funds, the Debtors will have no choice but to pursue an immediate cessation of operations and liquidation of the estates. An expeditious sale process is also necessary to stabilize the Debtors' rapidly deteriorating business and provide assurances to existing vendors, customers, and employees that they can and should continue to do business with, or remain employed by, the Debtors during these Chapter 11 Cases. With this in mind, the Debtors developed the Bidding Procedures, which are designed to preserve flexibility in this sale process, facilitate a quick but fair process, and generate the highest or best value for the Assets. The proposed deadlines in the Bidding Procedures create an appropriate timetable for the Sale, and are consistent with the Debtors' current liquidity position and the milestones under the Restructuring Support Agreement and DIP Facility.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2001-1 and 6004-1.

## BACKGROUND

### A.      General Overview

10.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

11.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration, which is fully incorporated herein by reference.

**B.      The Debtors' Prepetition Marketing Process**

12.      After diligently considering a number of restructuring alternatives and after discussions with their RBL Lenders, the Debtors determined to undertake a comprehensive marketing process.  The Debtors formally commenced their prepetition sale process on February 3, 2020, with the assistance of Guggenheim Securities, the Debtors' proposed investment banker. The Debtors, with the assistance of Guggenheim Securities, reached out to 148 potential acquiring parties and the Debtors ultimately entered into 41 confidentiality agreements with certain of those parties.  A virtual data room was established to provide potential buyers access to substantial information to assist them in formulating their indications of interest ("IOIs").  Management made confidential presentations to 13 parties who expressed an interest in acquiring all or a portion of the Debtors' business.

13.      In the midst of the Debtors' marketing process, the combined effects of the COVID-19 pandemic and tensions between OPEC and Russia lead to an unprecedented drop in global energy prices and market uncertainty.  Traditional funding streams and strategic alternatives have become less viable, with investors in, lenders to, and potential acquirors of, oil and gas entities reacting aversely to unprecedented oil and natural gas market volatility in the wake of COVID-19. Notwithstanding the foregoing, several parties continue to maintain interest in purchasing the Assets.

14.      Interested parties were advised that they initially would have until March 25, 2020 to submit IOIs for a transaction to acquire all or a portion of the Debtors' assets, through an in-court or out-of-court transaction.  Ultimately, 15 parties submitted IOIs by the initial deadline, and three additional parties submitted IOIs thereafter.

15.      On April 19, 2020, certain members of the Debtors' management advised the Board of Managers that they may submit a bid for the Assets.  On April 20, 2020, the Debtors

26578258.1

formed a special committee of the Board of Managers (the "Transaction Committee"), composed solely of directors disinterested in participating in the sale process, which was vested with sole authority over evaluating, negotiating, and approving any proposed sale transaction.  Since its appointment, the Transaction Committee has overseen the sale process, with the assistance of the Debtors' advisors.

16.    Over the course of April 2020, the Debtors and/or the Transaction Committee, as applicable, with the assistance of Guggenheim Securities, worked closely with the parties that submitted IOIs to explore and address transaction structure, diligence questions, timing, and process considerations.  As a result of this continued engagement with the bidders, nine parties submitted revised bids for the Assets, with such bids largely improving their terms from those contained in the bidders' initial IOIs.  The Transaction Committee, with the assistance of the Debtors' advisors, continues to engage in advanced discussions with certain of these parties regarding the submission of a binding bid for the Assets.

## REQUESTED RELIEF

### A.    Overview

17.    By this Motion, pursuant to sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, which:

> (a)    authorizes and approves the Bidding Procedures, substantially in the form attached as Exhibit 1 to the Bidding Procedures Order;
>
> (b)    approves the form and manner of notice in connection with the Debtors' selection of a Stalking Horse Bidder, if any, including the Bid Protections, if necessary;
>
> (c)    schedules the auction for the Assets (the "Auction"), if any;

(d)  schedules a hearing with respect to the approval of the sale of the Assets (the "Sale Hearing") for July 14, 2020 (subject to change, including depending on the Court's availability);

(e)  authorizes and approves the procedures set forth in the Bidding Procedures Order for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs, including the manner of notice relating thereto;

(f)  establishes deadlines in connection with the foregoing; and

(g)  authorizes and approves (i) notice of the Bidding Procedures, Auction Date, and Sale Hearing, in the form attached as Exhibit 2 (the "Sale Notice") to the Bidding Procedures Order and (ii) the Cure Notice, in the form attached as Exhibit 3 to the Bidding Procedures Order.

18.  In addition, the Debtors seek entry of a separate order, the Sale Order, to be considered at the Sale Hearing approving the sale of the Assets to the Successful Bidder. The Sale Order[3] will provide authority and approval of:

(a)  the sale of the Assets on the terms set forth in the asset purchase agreement(s) (the "APA") with the Successful Bidder, including the sale of the Assets free and clear of liens, claims, interests, and other encumbrances;

(b)  the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith; and

(c)  related relief.

**B.    Stalking Horse Bidder**

19.  By this Motion, and in connection with the Bidding Procedures, the Debtors are requesting authorization, but not direction, to enter into one or more APAs with one or more Stalking Horse Bidders, as applicable, (each, a "Stalking Horse APA"). The Debtors have provided copies of the form of APA to parties who have designated their interest in submitting a Bid and have made such forms of APA available in the electronic data room established by the

---

[3]  The proposed form of Sale Order will be filed with the Court on the date that is at least seven days before the Sale Objection Deadline.

Debtors in connection with the sale process.  As set forth in the Bidding Procedures, each bid must be based on the form APA and must include a markup showing any changes to the form of APA.

20.     The Debtors intend to consult with the Consultation Parties (as defined below) before selecting a Stalking Horse Bidder and granting binding bid protections, if any. Debtors will obtain the consent (such consent not to be unreasonably withheld) of the agent under the RBL Facility, the agent under the DIP Facility and the Majority Lenders (as defined in any order approving the DIP Facility) prior to entering into any Stalking Horse APA.  In the event that the Debtors enter into any Stalking Horse APA, the Debtors will file with the Court, and serve on the Sale Notice Parties (as defined below), a notice (the "Stalking Horse Notice") that will include: (a) the identification of the Stalking Horse Bidder; (b) a copy of the Stalking Horse APA; (c) the aggregate purchase price provided for in the Stalking Horse APA (the "Stalking Horse Purchase Price"); (d) the deposit paid by the Stalking Horse Bidder; and (e) the amount of any Break-Up Fee or any Expense Reimbursement (each, as defined below).

21.     The Bidding Procedures contemplate that the Debtors, in consultation with the Consultation Parties, would be authorized, but not obligated, in an exercise of their business judgment, to provide a binding, pre-approved break-up fee ("Break-Up Fee") and expense reimbursement for the reasonable and documented expenses incurred by any Stalking Horse Bidder (the "Expense Reimbursement," and, together with the Break-Up Fee, the "Bid Protections") to any Stalking Horse Bidder, on terms that are substantially similar to those routinely approved by bankruptcy courts in this district.

22.     In the event that the Debtors enter into a Stalking Horse APA on or prior to June 26, 2020 (the "Stalking Horse Deadline") the Debtors shall file with the Court and serve on the Sale Notice Parties (as defined below) a Stalking Horse Notice.  If the Stalking Horse APA

satisfies the following conditions, (a) the Break-Up Fee does not exceed 3.0% of the aggregate Stalking Horse Purchase Price; (b) the Expense Reimbursement does not exceed $750,000; (c) the Consultation Parties have provided their consent to the stalking horse designation; and (d) the Stalking Horse Bidder is not an insider (as defined in section 101(31) of the Bankruptcy Code), the Debtors may submit an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse APA as a stalking horse without the need for further hearing. If a Stalking Horse Bidder and Stalking Horse APA are designated that do not satisfy each of the conditions (a) through (d) in the prior sentence, the Court shall hold a hearing to consider approval of the designation of the Stalking Horse Bidder and Stalking Horse APA as a stalking horse to be held on the first date the Court is available that is at least five (5) business days after filing the applicable Stalking Horse Notice, with objections due at 4:00 p.m. the day prior to such hearing.

23.     Upon the entry of an order approving the designation of the Stalking Horse Bidder(s), the obligation of the Debtors to pay the Bid Protections will be an allowed administrative expense claim against the Debtors' estate under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. In such case, the Bid Protections will be payable by the Debtors to any Stalking Horse Bidder on the terms and conditions of the Stalking Horse APA.

24.     If the Debtors designate a Stalking Horse Bidder, the Stalking Horse Notice will identify the terms of the Bid Protections. Break-up fees and expense reimbursement are common terms offered to induce a Stalking Horse Bidder to commit to a transaction and incur associated expense and risk, even though the Debtors are still seeking better offers. The Debtors selected the proposed Break-Up Fee and Expense Reimbursement after a review of similar terms

for similar transactions, and submit they are set at a level that is fair and reasonable and will facilitate a value-maximizing transaction for the estates.

## C.    Bidding Procedures

25.    The Bidding Procedures seek to maximize the value of the Debtors' estates by facilitating an open and competitive sale of the Assets.  The Bidding Procedures set forth the process by which the Debtors are authorized, in consultation with the Consultation Parties (as defined herein), to conduct the Auction, if any, for the sale of all or substantially all of the Assets.

26.    The Debtors' proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale is as follows (all times referenced below refer to prevailing Eastern Time and are subject to the Court's availability):[4]

| Service of Sale Notice | June 4, 2020 |
|---|---|
| Publication of Sale Notice | At least 21 days prior to the Sale Hearing |
| Bidding Procedures Objection Deadline | June 18, 2020 at 4:00 p.m. |
| Service of Cure Notices | No later than June 23, 2020 (21 days before the Sale Hearing/14 days before the Sale Objection Deadline) |
| Cure/Assignment Objection Deadline | Within 14 days of service of Cure Notice, unless objecting specifically to the proposed form of adequate assurance of future performance of a Successful Bidder other than the Stalking Horse Bidder |
| Deadline to Select a Stalking Horse Bidder | June 26, 2020 |
| Bidding Procedures Hearing | June 30, 2020 at 11:30 a.m. |
| Bid Submission Deadline | July 6, 2020 at 5:00 p.m. |

---

[4]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures and Bidding Procedures Order, as applicable.

| | |
|---|---|
| **Deadline to Object to Approval of the Sale, including the Sale to the Stalking Horse Bidder, if any** (but excluding conduct of the Auction and adequate assurance of future performance objections pertaining to a Successful Bidder other than any Stalking Horse Bidder) | July 7, 2020 at 4:00 p.m. |
| **Determination of Qualified Bids** | July 7, 2020 |
| **Auction** | July 9, 2020 at 10:00 a.m. |
| **Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder ("Post-Auction Objection Deadline")** | July 13, 2020 at 12:00 p.m. |
| **Sale Hearing** | July 14, 2020 at 10:30 a.m. |

27.     While all interested bidders should read the Bidding Procedures in their entirety, the following summary describes their salient features and discloses certain information required pursuant to Local Rule 6004-1:[5]

---

[5]     The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between this summary and the provisions of the Bidding Procedures, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary, set forth in the accompanying text, or elsewhere in this Motion, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

| Auction Participation Requirements | |
|---|---|
| **Potential Bidder** | To participate in the bidding process, an entity interested in the sale process and Auction must provide the following to the Debtors: |
| | (a)      an executed confidentiality agreement on terms acceptable to the Debtors to the extent not already executed; |
| | (b)      evidence of such entity's financial capability to acquire the applicable Assets; |
| | (c)      if such entity has been formed for the purpose of acquiring some or all of the Assets, a written commitment from such entity's equity holder(s), sponsor(s), or other financial backer(s) ("<u>Bid Sponsor</u>") to be responsible for such entity's obligations in connection with participating in the bidding process and acquiring the applicable Assets and evidence of the Bid Sponsor's financial capability to acquire the applicable Assets; and |
| | (d)      any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the entity's fitness to participate in the bidding process or ability to timely acquire the Assets. |
| | (Bidding Procedures IV(B)) |
| **Due Diligence** | Potential Bidders will be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. |
| | (Bidding Procedures IV(C)) |
| **Qualified Bidders** | A Potential Bidder (i) that demonstrates the financial capability to consummate the Sale (as determined by the Debtors in consultation with the Consultation Parties), (ii) whose Bid is a Qualified Bid, and (iii) that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder is a Qualified Bidder. |
| | (Bidding Procedures IV(D)) |
| **Qualified Bid** | Along with other usual and customary bid requirements for a transaction of this size, a Bid by a Potential Bidder that satisfies each of the following requirements (the "<u>Bid Requirements</u>"), is a "<u>Qualified Bid</u>": |
| | (a)      <u>Assets</u>.  Each Bid must clearly state which of the Assets that the Qualified Bidder is agreeing to purchase and assume. |
| | (b)      <u>Assumption of Liabilities</u>.  Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume. |
| | (c)      <u>Purchase Price</u>.  Each Bid must clearly set forth the aggregate purchase price to be paid for the Assets, including and identifying |

separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities (the "Aggregate Purchase Price").

(d)     Minimum Bid.  At a minimum, each Company Bid must have an Aggregate Purchase Price that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, has a monetary value equal to or greater than the Aggregate Acquisition Consideration, plus the Expense Reimbursement and the Break-Up Fee (if applicable), plus $500,000 in cash or cash equivalents (the "Bid Threshold").

(e)     Markup of the APA.  Each Bid must be accompanied by a duly authorized and executed ("Proposed APA"), an electronic copy of such Proposed APA in Microsoft Word format, and a redline of such Proposed APA marked to reflect the amendments and modifications made to the form of APA or, if the Debtors have selected a Stalking Horse Bidder, the Stalking Horse APA.  If the Debtors have selected a Stalking Horse Bidder, each such Proposed APA must provide for payment in cash at closing of the Expense Reimbursement and the Break-Up Fee to the Stalking Horse Bidder.

(f)     Deposit.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate cash portion of the Aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

(g)     Qualified Bid Documents.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Proposed APA clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Aggregate Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

(h)     Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Aggregate Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance operations for the applicable Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee

approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

(i)     Contingencies; No Financing or Diligence Outs.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties.

(j)     Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each Bid Sponsor, if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors.

(k)     Adequate Assurance of Future Performance.  Each Bid must (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

(l)     Time Frame for Closing.  A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties, which time frame may include a closing by no later than August 31, 2020.

(m)     Binding and Irrevocable.  A Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors notify such Qualified Bidder that such Bid has not been approved as a Successful Bid or a Backup Bid at the Sale Hearings.

(n)     Expenses; Disclaimer of Fees.  Each Bid (other than the Stalking Horse Bid, if any) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination

fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, if any, and solely to the extent set forth in the Stalking Horse APA) will be permitted to request at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(o) <u>Authorization</u>. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(p) <u>As-Is, Where-Is</u>. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets, prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Assets or the completeness of any information provided in connection therewith or the Auction, except those expressly stated in the Stalking Horse APA, if any.

(q) <u>Adherence to Bid Procedures</u>. By submitting a Bid, each Qualified Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and after the conclusion of the Auction, if any, agrees not to submit a Bid, or seek to reopen the Auction.

(r) <u>Government Approvals</u>. Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

(s) <u>Government Approvals Timeframe</u>. Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

(t) <u>Consent to Jurisdiction</u>. By submitting a Bid, each Qualified Bidder agrees and shall be deemed to have agreed, to submit to the jurisdiction of the Bankruptcy Court and waives any right to a jury

26578258.1

|  | trial in connection with any disputes relating to the Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.<br><br>(Bidding Procedures IV(E)) |
|---|---|
| **Bid Deadline** | Each Bid, other than any Stalking Horse Bid, must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **5:00 p.m. (prevailing Eastern Time) on July 6, 2020.**<br><br>(Bidding Procedures IV(E)(21)) |
| **Treatment of Deposits** | The Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court; *provided, however*, that the Deposit of any Successful Bidder (including any Backup Bidder that becomes a Successful Bidder) may be forfeited to the Debtors or credited toward the Aggregate Purchase Price set forth in the Successful Bid, in either case as set forth in these Bidding Procedures. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five business days after the Sale Hearing. The Deposit of the Backup Bidder, if any, shall be returned to such Backup Bidder no later than three business days after the closing of the transaction with the Successful Bidder. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder (or Backup Bidder, as applicable) timely closes on its transaction, its Deposit shall be credited towards the applicable purchase price(s). If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of the Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder (or Backup Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors as partial compensation for the damages caused to the Debtors and their estates as a result of such breach or failure to perform without prejudice to any claims, rights, or remedies of the Debtors or their estates for additional damages.<br><br>(Bidding Procedures IV(K)) |
| **Auction** | |
| **Auction Time and Location** | The Auction, if any, shall take place at **10:00 a.m. (prevailing Eastern Time) on July 9, 2020** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York 10019, or such later date and time or other location, including by telephone or video conference, as selected by the Debtors, after consultation with the Consultation Parties, and timely communicated to all entities entitled to attend the Auction. The Auction, if any, shall be conducted in a timely fashion according to the procedures set forth herein. |

26578258.1

| | |
|---|---|
| | (Bidding Procedures IV(G)(4)) |
| **Qualified Joint Bid** | If one or more Bid(s) that constitute Qualified Bids are received but none of the Bid(s) on their own are better or higher than the Stalking Horse Bid, if the Debtors select a Stalking Horse Bid, if any, then the Debtors, in consultation with their advisors and the Consultation Parties, may (a) elect to conduct a sub-auction, (b) oversee and facilitate a series of negotiations among such Qualified Bidders, or (c) otherwise pursue any process that the Debtors, in consultation with their advisors and the Consultation Parties, believe will result in a value-maximizing joint Bid for the Assets (the "Qualified Joint Bid," and such Qualified Bidders, the "Qualified Joint Bidders"). <br><br> (Bidding Procedures IV(G)(1)) |
| **Cancellation of Auction** | If no Qualified Bids other than any Stalking Horse Bid are received in accordance with these Bidding Procedures, then the Debtors may cancel the Auction, and may decide, in the Debtors' reasonable business judgment in consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid and pursue entry of the orders approving a Sale of the Assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA. <br><br> If the Auction is cancelled, the Debtors shall promptly file a notice of cancellation of the Auction and designation of the Stalking Horse Bid as the Successful Bid. <br><br> (Bidding Procedures IV(G)(2)) |
| **Conduct of the Auction** | The Debtors and their professionals shall direct and preside over the Auction, if any, in consultation with the Consultation Parties. At the start of the Auction, the Debtors shall describe the material terms of the Baseline Bid for the Assets on the record. The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, if any, including the Baseline Bid, all applicable Overbids, and the Successful Bid. <br><br> Part IV(G) of the Bidding Procedures contain various other provisions governing the conduct of the Auction. |
| **Overbids;** <br><br> **Minimum Overbid Increment** | Any bid made at the Auction, if any, by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid(s) is an Overbid. <br><br> The Overbid(s) for the Assets shall provide for total consideration with a value that exceeds the value of the consideration under the Baseline Bid(s) by an incremental amount that is not less than $500,000 (as applicable, the "Minimum Overbid Increment"), and successive Overbids shall be higher than the Prevailing Highest Bid by at least the Minimum Overbid Increment. <br><br> (Bidding Procedures IV(G)(6)(a)) |

| | |
|---|---|
| **Announcing the Highest Bid** | Subsequent to each Overbid Round Deadline, the Debtors, shall announce whether the Debtors have identified in the applicable Overbid round, an Overbid (or combination of Overbids) as being higher or otherwise better than, in the Overbid round, the Baseline Bid plus the Minimum Overbid Increment, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria. <br><br> (Bidding Procedures IV(G)(6)(d)) |
| **Closing the Auction** | The Auction, if any, shall continue until there is one Bid (or a combination of Bids) for the Assets that the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest or otherwise best Bid (or Bids) for the Assets.  Such Bid(s) shall be declared the "Successful Bid" and such Qualified Bidder(s), the "Successful Bidder," at which point the Auction will be closed.  The Auction, if any, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid. <br><br> (Bidding Procedures IV(G)(8)) |
| **Backup Bid** | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Consultation Parties (the "<u>Backup Bid</u>"), shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. <br><br> (Bidding Procedures IV(H)) |
| **Closing with Backup Bidder** | At the Sale Hearing, the Debtors, in consultation with their advisors and the Consultation Parties, shall present the Successful Bid and any Backup Bid, to the Bankruptcy Court for approval.  The Sale Order submitted at the Sale Hearings shall provide that:  (i) if the Successful Bid is not consummated, the Debtors may file a notice with the Court designating the applicable Backup Bidder(s) as the applicable Successful Bidder(s), and such Backup Bidder(s) shall be deemed the Successful Bidder(s) for all purposes; and (ii)  the Debtors will be authorized, but not required, to consummate all transactions contemplated by the applicable Backup Bid, once so designated as the Successful Bid, without further order of the Bankruptcy Court or notice to any party. <br><br> (Bidding Procedures IV(J)) |

| Other Matters | |
|---|---|
| **Reservation of Rights** | The Debtors reserve their rights to modify the Bidding Procedures, in their reasonable business judgment and with the consent of the Consultation Parties (such consent not to be unreasonably withheld), in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the sale of the Assets, including: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction, including at the Auction and/or adjourning the Sale Hearing, including in open court, without further notice; (c) modifying the Bidding Procedures and/or adding procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) waiving, or imposing additional, terms and conditions set forth herein with respect to Potential Bidders and (f) rejecting any or all bids or Bids; *provided, however*, that the Debtors may not modify the rules, procedures, or deadlines, or adopt new rules, procedures, or deadlines that would impair in any material respect any Stalking Horse Bidder's right to payment of the Break-up Fee or the Expense Reimbursement unless (x) agreed in writing by such Stalking Horse Bidder and the Debtors (in consultation with the Consultation Parties) or (y) ordered by the Bankruptcy Court.<br><br>(Bidding Procedures IV(I)) |
| **Fiduciary Out** | Nothing in these Bidding Procedures shall restrain the board of directors, board of managers, or such similar governing body of any of the Debtors or their affiliates from taking any action, or refraining from taking any action to the extent that such board of directors, board of managers, or such similar governing body determines, based on the written advice of counsel that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided however*, that the Debtors shall provide the Consultation Parties with notice of such action or inaction as soon as practicable.<br><br>(Bidding Procedures IV(M)) |
| **Consultation Parties** | The term "Consultation Parties" shall mean the counsel and financial advisor to the RBL Agent and the administrative agent under the DIP Facility (the "Agents"). For the avoidance of doubt, in the event that one or more of the Agents submits a Bid, the counsel and financial advisor to the applicable Agent(s) shall remain Consultation Parties notwithstanding that the Agent(s) are deemed Qualified Bidders. The Debtors shall deliver any Bids received to the Consultation Parties within 24 hours of receipt of such Bid.<br><br>(Bidding Procedures IV(F)) |
| **Credit-Bid** | The Agents, on behalf of the RBL Lenders and/or the lenders under the DIP Facility, as applicable, shall be deemed to be Qualified Bidders and, subject to section 363(k) of the Bankruptcy Code, may submit a credit bid up to the |

|   | full amount of their respective obligations on their respective collateral any time, including after the Bid Deadline or during the Auction and any such bid will be considered a Qualified Bid, unless otherwise ordered by the Court for cause; *provided, however*, that (i) any such Credit Bid shall only serve as a "back-up" bid to any Stalking Horse Bid if the Debtors select a Stalking Horse Bid, and (ii) the Agents must provide Qualified Bid Documents to the Debtors no later than two (2) business days after the Bid Deadline and such Credit Bid shall remain irrevocable until the closing of the sale, if applicable (a "Credit Bid" and the Agent(s), upon such submission, "Credit Bidder(s)").  Other than with respect to the Qualified Bid Documents, the Credit Bid shall not be subject to the requirements in the Bidding Procedures for a Qualified Bid or a Backup Bid.  For the avoidance of doubt, the Credit Bidder cannot be designated as a Backup Bidder unless such party consents to such designation. |
|---|---|
|   | (Bidding Procedures IV(N)) |

## D.    Applicable Notices

28.    Upon entry of an order authorizing the Debtors to serve the Sale Notice, or as soon practicable thereafter, but in any event no later than 21 days prior to the Sale Hearing (the "Mailing Date"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon:  (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) all known creditors of the Debtors; (f) the Office of the United States Trustee for the District of Delaware; (g) the Internal Revenue Service; (h) the Securities & Exchange Commission; (i) the Office of the United States Attorney for the District of Delaware;

and (j) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (the "Sale Notice Parties").

29.     The Sale Notice shall indicate that copies of the Motion, the Stalking Horse APA, the Bidding Procedures Order, and all other documents filed with the Court can be obtained on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC ("KCC"), www.kccllc.net/TemplarEnergy.    The Sale Notice will also indicate the proposed deadline for objecting to the Sale and the anticipated date and time of the Sale Hearing, subject to the Court's availability.   In addition, the Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assignment Procedures (as described further below) at the Sale Hearing.  The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale with respect to known interested parties.

30.     The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1(E)(5), to publish the Sale Notice, as it may be modified for publication (the "Publication Notice"), in *The Oklahoman, PLS, Inc.* and *Hart Energy* at least 21 days before the Sale Hearing.  The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

**E.      Assumption and Assignment of the Executory Contracts and Unexpired Leases**

31.     At the closing of the Sale, the Debtors intend to assume certain executory contracts and unexpired leases designated by the Successful Bidder pursuant to section 365(b) of the Bankruptcy Code (the "Assumed Contracts") and assign such Assumed Contracts to the Successful Bidder pursuant to section 365(f) of the Bankruptcy Code.  The Debtors accordingly are seeking approval of proposed procedures to govern the assumption and assignment of all Assumed Contracts (the "Assignment Procedures").

32.     In accordance with the proposed Bidding Procedures Order, the Debtors will file with this Court and serve on each non-Debtor counterparty ("Non-Debtor Counterparty") to an executory contract or unexpired lease related to the Assets the Cure Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3, no later than 21 days before the Sale Hearing.  The Cure Notice will, among other things:

(a)     identify each executory contracts and unexpired leases that may be an Assumed Contract;

(b)     state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to section 365 of the Bankruptcy Code (the "Cure Amount");

(c)     include a statement that the assumption and assignment of such Contract is neither required nor guaranteed;

(d)     notify the Non-Debtor Counterparty that its contract(s) or lease(s) may be assumed and assigned to the Stalking Horse Bidder or, if a higher or better offer is received, to such Successful Bidder at the conclusion of the Auction;

(e)     inform the Non-Debtor Counterparty that objections (a "Cure/Assignment Objection"), if any, to one or more of (i) the proposed Cure Amount, (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance, and (iii) the proposed assumption, assignment and/or transfer of its contract(s) or lease(s) (including the transfer of any related rights or benefits thereunder), other than objections that relate specifically to the proposed form of adequate assurance of future performance of any Successful Bidder (other than the Stalking Horse Bidder), must (x) be in writing; (y) state with specificity the nature of such objection, including the amount of Cure Amount in dispute; and (z) be filed with this Court and properly served on the Notice Parties (as defined in the Bidding Procedures Order) so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days after service of the Cure Notice (the "Cure/Assignment Objection Deadline"); and

(f)     state the date of the Sale Hearing, and note the possibility of adjournment.

33.     The Debtors reserve the right to (i) supplement the list of potentially Assumed Contracts set forth in the Cure Notice in the event that the Debtors identify any additional potentially Assumed Contracts and (ii) modify the previously stated Cure Cost associated with any

potentially Assumed Contract.  In the event the Debtors exercise any of the rights reserved in this paragraph, the Debtors will promptly serve a supplemental Cure Notice (each, a "Supplemental Cure Notice").  Each Supplemental Cure Notice will include the same information with respect to the listed potentially Assumed Contracts as was included in the Cure Notice with the Cure/Assignment Objection Deadline for any Non-Debtor Counterparty listed on such Supplemental Cure Notice to file a Cure/Assignment Objection being (a) fourteen (14) days from the date of service of such Supplemental Cure Notice or (b) the date that is two (2) business days prior to the Sale Hearing.

34.     The Debtors propose that any Cure/Assignment Objection must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, and served so as to be received by the Contract Objection Deadline, on: (a) proposed counsel to the Debtors (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Robert A. Britton; Sarah Harnett; and Teresa Lii (emails: rbritton@paulweiss.com;  sharnett@paulweiss.com;  and  tlii@paulweiss.com));  and (ii) Young Conaway Stargatt and Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (Attn:  Pauline  K.  Morgan,  Jaime  Luton  Chapman,  and  Tara  C.  Pakrouh  (emails: pmorgan@ycst.com and jchapman@ycst.com, and tpakrouh@ycst.com)); (b) the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware, 19801 (Attn: Jane M. Leamy (email: jane.m.leamy@usdoj.gov)); and (c) counsel to the DIP Agent and RBL Agent (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, MA 02110 (Attn: Amy L. Kyle and Andrew J. Gallo (email:  amy.kyle@morganlewis.com  and  andrew.gallo@morganlewis.com))  and  (ii) Richards, Layton & Finger, P.A, One Rodney Square 920 North King Street Wilmington, DE 19801 (Attn: Mark D. Collins (emails: collins@rlf.com)) (collectively, the "Notice Parties").

35.     If the Successful Bidder is a party other than the Stalking Horse Bidder, objections to the proposed form of adequate assurance of future performance must be filed with the Court and served on the Notice Parties by the later of (i) the Post-Auction Objection Deadline and (ii) the Cure/Assignment Objection Deadline.

36.     If no objection to the proposed Cure Amounts is timely received, the Cure Amounts set forth in the Cure Notice or any Supplemental Cure Notice shall be controlling and binding upon the applicable Non-Debtor Counterparty, notwithstanding anything to the contrary in any assigned contracts or leases or other documents as of the date of the Cure Notice or Supplemental Cure Notice.

37.     To the extent that any Non-Debtor Counterparty does not timely file and serve an objection in accordance with Assignment Procedures set forth in the Bidding Procedures Order, such Non-Debtor Counterparty will be: (i) deemed to have consented to the Cure Amounts, if any; (ii) barred, estopped, and enjoined from asserting any additional Cure Amounts under the assumed and assigned executory contracts or unexpired leases; (iii) barred from objecting to the assumption and assignment of such contracts or leases to the applicable Successful Bidder; and (iv) barred from objecting to adequate assurance of future performance by such Successful Bidder.

38.     If the Debtors receive any Cure/Assignment Objection that relates solely to the proposed Cure Amount, the Debtors or an assignee may pay the undisputed portion of such Cure Amount and place the disputed amount in a segregated account pending further order of the Court or mutual agreement of the parties.  The objecting Non-Debtor Counterparty will have recourse only to the funds held in such segregated account.  So long as the disputed amount is held in such segregated account, the Debtors may, without delay, assume and assign the executory contract or unexpired lease that is the subject of such Cure/Assignment Objection.

**F.**     **Request to Set a Date for the Sale Hearing and Sale Objection Deadline**

39.    The Debtors intend to present the Successful Bid for approval by the Court at the Sale Hearing currently proposed on **July 14, 2020,** pending the Court's availability. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

40.    All objections to the approval of the Sale to the Stalking Horse Bidder (a "Sale Objection") must be in writing and filed on and served so as to be received by **July 7, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") with the Clerk of the Court, 824 Market St. North, 3rd Floor, Wilmington, Delaware  19801.  In addition, any Sale Objection must be served on the Notice Parties so as to be received on the Sale Objection Deadline. Further, any objections to the conduct of the Auction and Sale to a Successful Bidder other than the Stalking Horse Bidder must be in writing and filed at least one business day before the Sale Hearing.

<u>**BASIS FOR RELIEF**</u>

**A.**     **The Bidding Procedures Are Fair and Reasonable**

41.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.  As described above, the Bidding Procedures ensure a fair, comprehensive process that allows for the consideration of Bids, to the extent that transactions contemplated by such bids maximize value and can be executed efficiently and reliably.

42.    The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding and sale process is conducted fairly and will yield the highest or otherwise best value for their estates and

stakeholders.  The Bidding Procedures are designed to facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids for the Assets as provided in the Bidding Procedures.  The Bidding Procedures also provide potential bidders with sufficient notice and opportunity to submit the necessary materials to gain access to diligence materials necessary to submit a timely and informed bid.  Thus, the Debtors and all parties-in-interest can be assured that the consideration for the Assets, including the consideration to be provided by any Stalking Horse Bidder in exchange for the Assets if no other party submits a Qualified Bid, will be fair and reasonable.  At the same time, the Bidding Procedures afford the Debtors the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with the Consultation Parties, the highest or otherwise best offer for the Assets.

43.     The Debtors believe that the Bidding Procedures provide an appropriate framework for the sale of the Assets that will enable the Debtors to review, analyze and compare, in a relatively uniform fashion, all offers received to determine which offer is the highest or otherwise best offer and in the best interests of the Debtors' estates and creditors.  The Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids.  Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

**B.      Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

44.     The Debtors submit that compelling business justifications exist for the proposed Sale, and, therefore, the Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of

business, property of the estate . . ." 11 U.S.C. § 363(b)(1). "It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate. *Official Comm. of Subordinated Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Following the decision in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363. *See, e.g.*, *In re ICL Holding Co. Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to section 363 where there was a "legitimate business justification").

45.    "In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors, which essentially represent a 'business judgment' test." *In re Culp*, 550 B.R. 683, 697 (Bankr. D. Del. 2015). The "sound business purpose" test requires a debtor to establish that: "(1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

46.    As discussed above, the Debtors have been exploring transactions to restructure their indebtedness since fall of 2019 and began to pursue a going-concern sale of their business in February 2020. Based on the market feedback in response to that prepetition marketing process, the Debtors have reasonably concluded that an efficient sale of substantially all of their assets to the Successful Bidder represents the best opportunity for the Debtors to maximize value for the benefit of their stakeholders.

47.     Continuing the sale process commenced in February 2020 under the supervision of the Court will ensure that the Debtors' marketing process is open and comprehensive, yet expeditious, thereby establishing that the ultimate Sale to the Successful Bidder represents a fair transaction while preserving the value of the Debtors' brands and limiting the time and cost spent during the course of these Chapter 11 Cases.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets.  It will allow the market to test the purchase price for the Assets, ensuring a greater recovery to stakeholders than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder and establish that the Debtor and such bidder have proceeded in good faith.  Consequently, the proposed Sale in accordance with the Bidding Procedures satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.

48.     Lastly, the Assets have already been exposed to the market through an extensive prepetition process, including contacting 148 interested parties in the sales process.  The Debtors are also proposing extensive notice of the sale in the Chapter 11 Cases, including direct notice to potentially interested purchasers and the Debtors' creditors and publication notice in a nationally-circulated newspaper, to ensure that all interested parties are aware of the opportunity to further submit bids for the Debtors' assets.

49.     Accordingly, the Debtors submit that the Sale of the Assets as contemplated herein and pursuant to the process set forth in the Bidding Procedures is in the best interests of the Debtors, their estates and creditors, and should be approved.

**C.      The Assets Should be Sold Free and Clear of Claims, Liens, and Encumbrances Under Section 363(f) and Successor Liability Claims**

50.      The Debtors also submit that the Sale of the Assets should be free and clear of any and all claims, liens and encumbrances under section 363(f) of the Bankruptcy Code (other than "Assumed Liabilities" and "Permitted Encumbrances" as provided in the Stalking Horse APA, or the APA, as applicable).  Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens and encumbrances. *See In re Pacific Energy Res Ltd., et al.*, Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); *In re Flying J Inc., et al.*, Case No. 08-13384 (MFW) (Bankr. D. Del. July 27, 2009); *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992).

51.      The Debtors submit that each lien that is not an assumed liability or permitted encumbrance under the Stalking Horse APA or APA, as applicable, or any Backup Bid satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code.  If an entity with liens on the Assets does not consent to the proposed Sale of such assets, the Debtors intend to demonstrate at the Sale Hearing their satisfaction of the requirements of section 363(f) of the Bankruptcy Code.  Alternatively, the Debtors may sell the Assets free and clear of any other interests under section 363(f)(5) of the Bankruptcy Code because the liens on any assets sold will

attach to the cash proceeds of the Sale in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings. Accordingly, pursuant to section 363(f) of the Bankruptcy Code, the Debtors may sell the Assets free and clear of all claims, liens and encumbrances.

52.    Moreover, the Debtors will send the Sale Notice to any purported lienholders. If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed. Accordingly, the Debtors request that unless a party asserting a lien on any of the Assets (other than with respect to assumed liabilities and permitted encumbrances (as described in the Stalking Horse APA or other APA, as applicable)) timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing. *See Hargave* v. *Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that, by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead* v. *Wooten*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same); s*ee also Precision Indus., Inc.* v. *Qualitech Steel SBQ, LLC,* 327 F.3d 537, 548 (7th Cir. 2003) (finding that a lessee who did not object to the Sale Order or seek adequate protection had no additional recourse when leasehold interest was sold through a section 363 sale).

53.    It is also appropriate to sell the Assets free and clear of successor liability relating to the Debtors' business. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (approving sale of assets pursuant to section 363(f) barred successor liability claims

for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

54.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' business, but should hold the Assets free and clear.

**D.     The Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

55.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147; *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Temtechco, Inc.*, 1998 WL 887256, at *5 (D. Del. 1998); *In re Congoleum Corp.*, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

56.     In approving the Sale free and clear of all claims, liens, and encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m)

of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will

be the result of a competitive bidding process and arm's-length, good-faith negotiations, and

parties in interest will have the opportunity to review and object to a proposed transaction.  *See*

*Esposito* v. *Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987)

(holding good faith purchasers are protected under section 363(m) where notice is provided to

lienholders).

      57.    The Debtors diligently formulated the Bidding Procedures to ensure an

open, fair process.   Of note, the Bidding Procedures provide for the continuation of the

comprehensive sale process that the Debtors, with the assistance of their advisors, launched

prepetition; they permit Bids for all or some of the Company's assets.  Pursuant to the Bidding

Procedures, the Debtors will consider all Qualified Bids, whether such Bids are for some or all of

the Company to ensure an arms'-length, good faith sale process.

      58.    Accordingly, the Debtors request that the Sale Order include a provision

that the Successful Bidder for the Assets is a "good faith" purchaser within the meaning of

section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful

Bidder with such protection will ensure that the maximum price will be received by the Debtors

for the Assets.

**E.**      **The Bid Protections May be Necessary to Preserve the Value of the Debtors'**
              **Estates, Are Fair and Reasonable, and Should Be Approved**

      59.    By this Motion, the Debtors reserve the right to enter into a Stalking Horse

APA, with the consent (such consent not to be unreasonably withheld) of the RBL Agent, the DIP

Agent and the Majority Lenders (as defined in any order approving the DIP Facility), as an exercise

of their business judgment and in accordance with the Bidding Procedures, and to offer Bid

Protections in connection therewith.  Specifically, the Debtors may offer any Stalking Horse

Bidder some or all of the following Bid Protections: (a) a Break-Up Fee and (b) an Expense Reimbursement. The Debtors respectfully reserve the right to seek approval of break-up fees and expense reimbursement in excess of the Bid Protections on an expedited basis.

60.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling estate assets. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (quoting *In re Schípper*, 933 F.2d at 515); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656-7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").    With respect to the granting of bid protections, the Third Circuit has held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Reliant Energy Channelview LP* v. *Kelson Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp.* v. *O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.),* 181 F.3d 527 (3d Cir.1999)).

61.     Therefore, the Third Circuit has ruled that bid protections must meet the standard set forth in the administrative expense provisions of section 503(b) of the Bankruptcy Code, which is generally satisfied if such bid protections provide some benefit to the debtor's estate. *See In re Energy Future Holdings Corp.,* 904 F.3d 298, 314 (3rd Cir. 2018)*, In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Benefits to the debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would

not have been made and without which bidding would had been limited" and where the availability

of the break-up fees and expenses "were to induce a bidder to research the value of the debtor and

convert that value to a dollar figure on which other bidders can rely. . . increasing the likelihood

that the price at which the debtor is sold will reflect its true worth." *Id.* at 537.

62.      The Debtors believe that the Bid Protections increase the likelihood of a

sale to a contractually committed bidder at a price the Debtors believe is fair, while providing the

Debtors with an opportunity to enhance the value to their estate through an auction process.

Without the Bid Protections, a Stalking Horse Bidder may not be willing to enter into an APA.

The amount of the Bid Protections are a result of good-faith efforts and reasonable and appropriate

in light of the size and nature of the Sale and the efforts that likely will be expended by a Stalking

Horse Bidder.  Payment of the Bid Protections also will not diminish the value of Debtors' estates,

as the Debtors do not intend to terminate any Stalking Horse APA and pay the Bid Protections,

unless doing so would permit the Debtors to accept a better Bid.

63.      The Break-Up Fee, which represents approximately 3.0% of the Stalking

Horse Purchase Price, is reasonable and well within the range of bid protections typically approved

by bankruptcy courts in the Third Circuit.  *See, e.g.*, *In re Earth Fare, Inc.*, Case No. 20-10256

(KBO) (Bankr. D. Del. Feb. 14, 2020) (approving a break-up fee of 3% and expense

reimbursement of the lesser of $50,000 and 1.5% of the purchase price prior to identification of

stalking horse bidder); *In re Celadon Grp., Inc.*, Case No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6,

2020) (approving a break-up fee of 3% and expense reimbursement of 1.5% of the purchase price

prior to identification of stalking horse bidder); *In re GCX Ltd.*, Case No. 19-12031 (CSS) (Bankr.

D. Del. Sept. 25, 2019) (authorizing the Debtors "to provide other appropriate and customary

protections to a Stalking Horse Bidder that are reasonably acceptable to the Secured Parties"); *In*

*re Hosp. Acquisition LLC*, Case No. 19-10998 (BLS) (Bankr. D. Del. June 27, 2019) (approving

in advance of identification of a stalking horse bidder a break-up fee of 3% of bid price and expense

reimbursement of $250,000); *In re American Apparel, LLC, et al.*, No. 16-12551 (BLS) (Bankr.

D. Del. Dec. 5, 2016), (approving break-up fee of 3.0% in connection with a $66 million sale of

assets); *In re BPS US Holdings Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016)

(approving break-up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia*

*Systems, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 5, 2016) (approving break-up fee of 3%

in connection with a $19 million sale of assets).

## F.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

64.    Section 365(a) of the Bankruptcy Code provides, that a debtor in

possession, "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a). Courts use the business judgment standard

to determine whether to approve a debtor's decision to assume or reject an executory contract or

unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (stating

that the assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy

court"); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a

debtor's decision to assume or reject an executory contract is governed by the "business judgment"

standard). The business judgment test "requires only that the trustee [or debtor in possession]

demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-*

*Pittsburgh Steel Corp.* v. *West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R.

845, 846 (Bankr. W.D. Pa. 1987) *quoting In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr.

S.D.N.Y.1984). A more exacting scrutiny would harm the estate through increased costs and

further, "would slow the administration of a debtor's estate, . . . interfere with the Bankruptcy

Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Pursuant to section 105(a) of the Bankruptcy Code, a court may issue orders or decrees that help preserve or protect the value of a debtor's assets.  *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

65.    The assumption and assignment of executory contracts and unexpired leases, as designated by the Successful Bidder, is crucial to the Debtors' ability to obtain the best value in connection with the Sale and falls well within the reasonable exercise of the Debtors' business judgment.  Pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default which is required to be cured, including compensating or providing adequate assurance of prompt compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).  Once an executory contract is assumed, the trustee or debtor in possession may elect to assign it.  *See In re Rickel Home Centers, Inc*., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate"). Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract. . . only if the trustee assumes such contract. . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *Carlisle Homes, Inc.* v. *Arrari (In re Carlisle Homes, Inc.)*, 103 B.R.

524, 538 (Bankr. D.N.J. 1989).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

66.    The Debtors respectfully submit that the Assignment Procedures are appropriate and reasonably tailored to provide Non-Debtor Counterparties with adequate notice of the potential assumption and assignment of their contracts and leases, as well as proposed Cure Amounts, if any.   Non-Debtor Counterparties will have the opportunity to object to the Cure Amounts listed in the Cure Notice, or to the assumption and assignment of their contracts and leases on other grounds, including concerns regarding inadequate assurance of future performance. The Assignment Procedures further provide that, in the event an objection is not resolved, the Court will determine the disputed issues.   Accordingly, the Debtors submit that implementation of the Assignment Procedures is appropriate under the facts and circumstances of the Chapter 11 Cases and the proposed Sale.

67.    For the foregoing reasons, the Debtors submit that the assumption and assignment to the Successful Bidder of the Debtors' contracts and leases should be approved as an exercise of the Debtors' sound business judgment.

## G.    The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances

68.    The Debtors will serve the Sale Notice and the Cure Notice and propose to publish the Publication Notice in *The Oklahoman, PLS, Inc.* and *Hart Energy* in accordance with the Bidding Procedures Order.   The notice of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

69.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the

sufficiency of notice and adequacy of service.  As discussed below, the content and manner of

service of this Motion and the related notices satisfy all such requirements:

(a)     Section 363 Notice – section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A).  As set forth above, creditors will be provided notice of the salient details regarding this Motion and the Sale Hearing through service of this Motion, the Sale Notice, the Publication Notice, and the Cure Notice, each as described herein.  Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

(b)     Bankruptcy Rule 2002 – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

(c)     Bankruptcy Rules 6004 and 6006 – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties-in-interest as the Court may direct.  The Sale Notice and the Cure Notice have been or will be served on the Non-Debtor Counterparties to the Assigned Contracts, thereby satisfying this requirement.

(d)     Procedural Due Process – The notices of this Motion and the Sale that are being provided as described herein, including the notice being provided by publication as described herein and the Bidding Procedures Order, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  *See Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Parties-in-interest have been and should be found to have been afforded adequate notice of this Motion, the Sale, the Bidding Procedures and the other relief requested herein.

70. The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, the Bid Protections, and the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of their assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

## H. The Stay of the Sale Order Should be Waived

71. Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for 14 days after the entry of an order unless the Court orders otherwise.

72. The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Assets and assignment and assumption of the related executory contracts and/or unexpired leases. To require the Debtors to effectively be liable under the applicable executory contracts and/or unexpired leases for an extra 14 days and to delay the closing and the resulting reductions of the Debtors' secured obligations and related adequate protection obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources. The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) are routinely granted. *See, e.g., In re Southland Royalty Company LLC,* Case No. 20-10158 (KBO) (Bankr. D. Del. April 29, 2020); *In re RentPath Holdings*, *Inc.*, Case No. 20-10312 (BLS) (Bankr. D. Del. March 10, 2020); *In re High Ridge Brands Co.*, Case No. 19-12689 (BLS) (Bankr. D. Del. Feb. 7, 2020); *In re Bumble Bee Parent*, *Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019); *In re HRI Holding Corp.*, Case No. 19-12415 (MFW) (Bankr. D. Del. Dec. 5, 2019); *In re Sienna Biopharmaceuticals, Inc.*, Case No. 19-12051 (MFW) (Bankr. D. Del. Nov. 13, 2019); *In re The News-Gazette, Inc.*, Case No. 19-11901 (KBO) (Bankr.

D. Del. Sept. 18, 2019); *In re Hobbico, Inc.*, Case No. 181005 (KG) (Bankr. D. Del. March 14, 2018).

## NOTICE

73.      Notice of this Motion has been or will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the RBL Agents, Morgan, Lewis & Bockius, LLP;  (d) the United States Attorney's Office for the District of Delaware; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors request that the Court enter the Bidding Procedures Order and the Sale Order granting the relief requested herein and such other and further relief as is just and proper.

Dated:   June 1, 2020          YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Wilmington, Delaware

      */s/  Jaime Luton Chapman*
Pauline K. Morgan (No. 3650)
Jaime Luton Chapman (No. 4936)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: pmorgan@ycst.com
      jchapman@ycst.com
      tpakrouh@ycst.com

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Sarah Harnett (admitted *pro hac vice*)
Teresa Lii (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: pbasta@paulweiss.com
      rbritton@paulweiss.com
      sharnett@paulweiss.com
      tlii@paulweiss.com

*Proposed Co-Counsel to the Debtors and Debtors-in-Possession*

26578258.1